UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ISAAC MONTANEZ,

                Plaintiff,

      -v-                                    1:16-CV-447

MCDEAN LLC,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                    OF COUNSEL:

ISAAC MONTANEZ
Plaintiff, pro se
65 N. Lake Avenue, 2d Floor
Albany, NY 12206

JACKSON LEWIS P.C.                       KRISTI RICH WINTERS, ESQ.
Attorneys for Defendant                  CLEMENTE J. PARENTE, ESQ.
677 Broadway, 9th Floor
Albany, NY 12110

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

### I. INTRODUCTION

      On April 19, 2016, pro se plaintiff Isaac Montanez ("Montanez" or "plaintiff") filed this civil rights action against defendant McDean, LLC ("McDean" or "defendant"), his former employer. According to plaintiff's complaint, defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII") by discriminating against him on the basis of his race and national origin ("First Cause of Action"), by permitting other employees to sexually harass him

("Second Cause of Action"), and by retaliating against him after he filed a complaint with the New York State Division of Human Rights ("DHR") ("Third Cause of Action").

On August 29, 2017, McDean moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 seeking summary judgment on all of Montanez's claims. According to defendant, the undisputed facts show that plaintiff was terminated after he repeatedly violated workplace rules. The motion is fully briefed and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted.[1] McDean operates a franchised McDonald's restaurant (the "Restaurant") located at 391 Central Avenue in Albany, New York. In April of 2015, General Manager Matthew Mead ("Mead") hired Montanez, a hispanic male of Puerto Rican descent, to work as a "crew member" at the Restaurant.[2] In that role, plaintiff reported to both Mead and to Guest Services Manager Carriann Schaub ("Schaub"). Plaintiff worked a full-time schedule at the Restaurant, from approximately 5:00 a.m. to 2:30 p.m., five days a week.

Montanez and other crew members were responsible for preparing food, washing dishes, and cleaning the bathrooms, floors, and other areas of the Restaurant. The Restaurant employed approximately ten crew members: five or six females and three

---

[1] Montanez failed to properly contest McDean's Statement of Material Facts, ECF No. 32-5, despite being properly warned about the consequences that would flow from such a failure, ECF No. 32-6. However, mindful of his pro se status and of the potentially case-ending nature of defendant's motion, plaintiff's various submissions have been independently reviewed to identify any genuine disputes over the facts.

[2] Montanez testified in his deposition that he actually worked at the Restaurant for a three-week period before April of 2015, but was fired and then re-hired by Mead. Parente Decl. Ex. A ("Pl.'s Dep.").

males. All crew members were required to acknowledge and abide by various workplace policies, including three identified by the Restaurant as particularly relevant here.

First, the Restaurant's "Attendance Policy" authorized the immediate termination of an employee who failed to provide advance notice to management of an inability to work a scheduled shift (known as a "no call/no show"). Second, the "Crew Meal/Break Policy" limited the circumstances in which an employee could eat Restaurant food during a shift. Third, the "Offenses/Conduct While Working Policy" authorized disciplinary action, up to and including immediate termination, if an employee failed to provide advance notice to management of an inability to work a scheduled shift or if an employee gave away food or other company products.

Montanez's brief tenure as a Restaurant crew member was riddled with disciplinary issues. For instance, Mead was forced warn plaintiff to stop smoking while he was on the clock; i.e., to stop taking unauthorized trips to the dumpster behind the Restaurant while on duty. According to defendant, trash removal was primarily the responsibility of the Restaurant's two maintenance employees, not crew members like plaintiff.

On May 5, 2015, Schaub confronted Montanez about the same issue after she caught him returning to work through the front door.[3] Plaintiff became "very agitated and combative" in response to this exchange. When Schaub instructed him to clock out and go home for the day, plaintiff refused. According to plaintiff, he then "blacked out" and exited through the back door, tripping the Restaurant's security alarm. Eventually, Schaub was forced to call

---

[3] Montanez claims he had permission from Schaub to take out the trash. According to defendant, crew members need a manager's key to open the back door from the outside, which is given out only when a manager authorizes the disposal of trash. Plaintiff did not have the key.

the police for assistance in removing plaintiff from the Restaurant.  Schaub told plaintiff not to return to work until he spoke with Mead.

Later that day, Schaub filled Mead in on her confrontation with Montanez.  Mead reviewed the Restaurant's surveillance footage to confirm her account of the incident.  According to defendant, the footage "clearly showed" plaintiff "going out the back door in violation of Restaurant policy."  Mead also verified Schaub's account of the confrontation with Shift Manager Margarita Nunez ("Nunez"), an eyewitness to the encounter.

Two days later, on May 7, 2015, Mead met with Montanez to discuss the incident.  During the meeting, plaintiff complained to Mead that Schaub had "made sexual advances toward him because on one occasion she asked him if he wanted to go out with her."  Plaintiff also complained to Mead that Schaub and Kitchen Manager Orlando Collazo–Nieves ("Collazo–Nieves") had called him a "fake Puerto Rican" and accused him of "want[ing] to be black" after discovering plaintiff was dating an African–American woman.

After hearing Montanez's complaints, Mead determined that both plaintiff and Schaub had overreacted that day.  Mead reminded plaintiff that he was not permitted to go out the back door to smoke during his shift and explained to plaintiff that the Restaurant's management "would put the incident behind him."  Plaintiff returned to his normal work schedule at the Restaurant.

A week later, on May 14, 2015, Montanez filed an administrative charge with the DHR in which he alleged discrimination and harassment based on his race, national origin, gender, and disability.  According to plaintiff's administrative complaint, Schaub told him "she liked Spanish guys" and Collazo–Nieves made an inappropriate comment about plaintiff's girlfriend.  Plaintiff further claimed that Schaub and Collazo–Nieves frequently engaged in

conversation of a sexual nature. Finally, plaintiff alleged that Schaub and Collazo–Nieves stopped allowing him to take smoke breaks while he took out the trash after he told them he suffered from depression.

On May 22, 2015, Area Manager Clarence Dixon ("Dixon"), Mead's direct supervisor, went to the Restaurant to speak with Montanez and to investigate the allegations plaintiff made in his DHR complaint. Plaintiff told Dixon that Nunez was harassing him and that she had made at least one derogatory comment about African–Americans. Dixon spoke with Nunez, Schaub, Collazo–Nieves, and other Restaurant employees, but could not substantiate any of plaintiff's claims. Instead, Dixon concluded that plaintiff had been "insubordinate and abusive" in his interactions with Nunez and other Restaurant managers.

On June 5, 2015, Montanez received a written warning after he again took out the trash without authorization. Five days later, on June 10, plaintiff was sent home after Shift Manager Nakaya Brown ("Brown") saw him eating a hamburger during his shift. Plaintiff admits that he "took a bite of a hamburger," but argues that "[e]verybody used to eat" while on duty. When Mead found out about this, he reviewed the Restaurant's surveillance footage and confirmed Brown's account.

On June 11, 2015, on the basis of this policy violation, Mead issued another written warning to Montanez. At that time, Dixon and Mead met with plaintiff and reminded him that eating Restaurant food on duty was theft and could result in his immediate termination. In addition, both managers informed plaintiff he was being placed on a ninety-day probationary period in which any further policy violations would result in his termination. Plaintiff refused to sign this final written warning.

On June 16, 2015, Montanez was given another written warning after he took an overlong lunch break.  However, Mead and Dixon did not fire plaintiff at this point.  Instead, plaintiff continued working until July 3, when Briseiada Vasquez ("Vasquez"), a pregnant employee who worked alongside plaintiff, reported to Schaub that plaintiff had made "inappropriate comment[s] about her need to constantly use the bathroom."  Schaub informed Mead, who spoke with plaintiff.  Plaintiff became "loud and confrontational" and accused Vasquez of "setting him up."  Mead told plaintiff that his behavior was inappropriate and sent him home.

Although he was scheduled to work on July 5, 2015, Montanez did not show up or call in to let the Restaurant know he would not be able to work that day.  According to plaintiff, Mead had given him the day off.  The next day, July 6, plaintiff again failed to show up to work or to call in even though he was scheduled to work a shift at the Restaurant.

On July 7, 2015, Mead suspended Montanez until he could meet with Dixon to discuss the matter.  Plaintiff filed another DHR complaint later that same day.  This administrative charge included complaints about Schaub, Nunez, and Brown.  Among other things, plaintiff's second complaint stated he was reprimanded by Brown after being "seen eating on duty" and was shouted at by Schaub after telling Vasquez she "could not leave her workstation" to use the restroom.

On July 13, about a week after the suspension first began, Montanez met with Dixon.  Although he admitted he did not show up to work on July 6 or call in to report his absence, plaintiff claims a co-worker told him no to come in until he spoke with Mead.  Nevertheless, Dixon and Mead concluded that plaintiff's repeated policy violations, and in particular his July 6 "no call/no show" during probation, warranted termination.

On November 10, 2015 and December 31, 2015, the DHR issued separate orders dismissing Montanez's administrative complaints after completing investigations into the allegations. Thereafter, plaintiff received a "Dismissal and Notice of Rights" from the U.S. Equal Employment Opportunity Commission ("EEOC"). This action followed.

## III. LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

A court deciding a summary judgment motion must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426

F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (holding that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Finally, when "a party moves for summary judgment against a *pro se* litigant, courts afford the non-moving party 'special solicitude.'" Sec. & Exch. Comm'n v. Penn, 225 F. Supp. 3d 225, 233 (S.D.N.Y. 2016) (quoting Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010)). For instance, "[d]istrict courts must read a *pro se* litigant's pleadings liberally and interpret them to raise the strongest arguments that they suggest," and in general courts "are less demanding of [*pro se*] litigants generally, particularly where motions for summary judgment are concerned." Id. (citations and internal quotation marks omitted).

## IV. **DISCUSSION**

McDean contends that Montanez's various civil rights claims must be dismissed because it is undisputed that the Restaurant properly terminated plaintiff in response to his repeated violations of workplace policies. Plaintiff, for his part, claims he was "set-up" by "managers," who gave him permission to take the trash out. In addition, plaintiff argues that defendant's managers retaliated against him by scrutinizing his work, giving him menial tasks, and writing him up "for any reasons." Finally, plaintiff claims other employees were permitted to eat and smoke on duty.

### A. **Title VII Discrimination** (First Cause of Action)

Montanez's complaint asserts a discrimination claim based on his race and national origin. At summary judgment, this claim is subject to the analytical framework first introduced

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a three-part burden-shifting scheme laid out by the Supreme Court in an effort to "sharpen the inquiry into the elusive factual question of intentional discrimination." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted).

"This framework places the initial burden of establishing a prima facie case of discrimination on the plaintiff, who must demonstrate that:  (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." Croons v. N.Y. State Office of Mental Health, 18 F. Supp. 3d 193, 202 (N.D.N.Y. 2014) (citing Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010)).

"A plaintiff's burden of establishing a *prima facie* case is *de minimis*." Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).  Once the plaintiff clears this initial hurdle, "[t]he burden then shifts to the defendant to offer 'legitimate and non-discriminatory reasons for the adverse employment action demonstrate in plaintiff's prima facie case.'" Croons, 18 F. Supp. 3d at 202 (quoting Risco v. McHugh, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012)).

The burden at this stage is also "light," and "[t]he employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." Croons, 18 F. Supp. 3d at 202-03 (citation omitted).  In other words, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." Id. (citation and internal quotation marks omitted).

- 9 -

"If the defendant satisfies its burden of production, then the presumption raised by the prima facie case is rebutted and drops from the case." Bucalo, 691 F.3d at 129 (citation and internal quotation marks omitted).  "At the final stage, the plaintiff then has 'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision'—a burden that 'merges with the ultimate burden of persuading the court that [ ]he has been the victim of intentional discrimination.'"  Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).[4]

"[I]n order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence; it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." Croons, 18 F. Supp. 3d at 203 (citation omitted).  In making this determination, a court may examine "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." Bader, 985 F. Supp. 2d at 305.

At the outset, the context of this case is somewhat noteworthy:  Mead, Montanez's direct supervisor, is the manager who made the initial decision to hire him.  Mead is also the manager who later chose to terminate him, and he did so in a relatively short span of time. Varno v. Jefferson Cty. Dep't of Planning, 2015 WL 5602965 at *5 (N.D.N.Y. Sept. 23, 2015) ("Courts have ruled that a strong inference that discrimination was not a motivating factor in an employee's discharge is created when the individual who made the discharge

---

[4] "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Croons, 18 F. Supp. 3d at 203 (quoting Risco, 868 F. Supp. 2d at 99).

decision is the same individual who hired the employee, and the hiring and discharge occur within a relatively short time span.").

Further, Montanez's complaints about being "forced to do menial tasks" and laboring under excessive "scrutiny" about his work performance are insufficient bases on which to sustain a discrimination claim. Regardless of whether or not other crew members were subjected to the exact same work responsibilities, the record indicates that "menial" tasks and close supervision were part and parcel of a crew member's job description and therefore neither one of these complaints constitutes an "adverse employment action" within the meaning of Title VII. See, e.g., Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 222 (E.D.N.Y. 2014) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."); MacEntee v. IBM (Int'l Business Machs.), 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (rejecting argument that close scrutiny of the plaintiff's workplace conduct constituted an adverse employment action).

In addition, Montanez's complaints about one or more of his fellow crew members making insensitive or even offensive comments about his national origin, or about his girlfriend's race, fail for substantially the same reason. See, e.g., Davis v. NYS Dep't of Corr. Attica Corr. Facility P.O. Box 149 Attica, N.Y. 14011, 46 F. Supp. 3d 226, 236 (W.D.N.Y. 2014) ("Whispering, gossiping, and making negative comments about an employee [ ] do not rise to the level of an adverse employment action . . . .").

This leaves for consideration the issues of Montanez's placement on disciplinary probation[5] beginning June 11 and his discharge just over one month later on July 13. In this

---

[5] See, e.g., Johnson, 58 F. Supp. 3d at 223 (suggesting that being placed on probation might constitute an adverse employment action).

- 11 -

case, the Restaurant has articulated legitimate, nondiscriminatory reasons for both of these adverse employment actions; i.e., plaintiff's repeated violations of the Restaurant's workplace policies.  Accordingly, the remaining question is whether plaintiff can demonstrate that these stated reasons are a mere pretext to mask some form of discriminatory animus.  See Howard v. MTA Metro-North Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) ("Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action."); see also Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 313 (N.D.N.Y. 2013) (Kahn, J.) (adopting same approach in an effort to "avoid redundancy").

This kind of showing can be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Campbell v. Cellco P'ship, 860 F. Supp. 2d 284, 302 (S.D.N.Y. 2012) (citation omitted); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) ("[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.").

For instance, "[a] discrimination claimant may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Bombero v. Warner-Lambert Co., 142 F. Supp. 2d 196, 203 n. 7 (D. Conn. 2000) (citations omitted).

Importantly, "courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Tu Ying Chen v. Suffolk Cty. Cmty. Coll., 2017 WL 2116701, at *6 (E.D.N.Y. Mar. 31, 2017) (quoting Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000)).

After reviewing the parties' submissions, this is a showing Montanez simply cannot make. Even resolving the few factual disputes in his favor for purposes of this motion, no reasonable jury could conclude that unlawful discrimination played a motivating role in the Restaurant's decision to place plaintiff on probation and, when he failed to reform his behavior, to terminate him.

Notably, Montanez admits to violating several policies, including the policy against smoking on duty and the policy against eating Restaurant food on duty. Equally notable is the fact that plaintiff's complaints about Schaub were transmitted to Mead, a manager who made independent decisions about whether to take disciplinary action against plaintiff. According to plaintiff's own submissions, Mead was someone with whom plaintiff stated he "was cool"; i.e., a person with whom plaintiff had no problems or other issues. Simply put, no jury could conclude that the progressive, repeated discipline meted out under the circumstances present in this case was a pretext for discriminatory animus

attributable to plaintiff's employer.⁶  Accordingly, plaintiff's discrimination claim (First Cause of Action) must be dismissed.

### B. Title VII Sexual Harassment (Second Cause of Action)

Montanez complaint also asserts a discrimination claim based on being "sexual[ly] harassed because of [his] sex."

"[T]he kinds of workplace conduct that may be actionable under Title VII . . . . include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'"  Redd v. N.Y. Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

When evaluating this kind of claim, a court must consider all of the circumstances, including:

> [t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Redd, 678 F.3d at 175 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Upon review, Montanez cannot sustain this kind of Title VII claim.  Plaintiff complains that on one occasion Schaub "asked him if he wanted to go out with her," on another

---

⁶ According to plaintiff's own deposition testimony, the Restaurant's crew members and managers were from a diverse ethnic background.  For instance, one of the other male crew members was "Dominican," and another was "Puerto Rican," as were plaintiff and Collazo–Nieves.  In the absence of any indication that fellow class members were also somehow treated unfavorably, a plaintiff asserting national origin discrimination faces a particularly high hurdle in claiming a causal connection to his protected class under those circumstances.  Cf. Dellaporte v. City Univ. of N.Y., 998 F. Supp. 2d 214, 227 (S.D.N.Y. 2014) ("It is difficult to imagine how an equally racially balanced workplace could give rise to an inference of discriminatory animus.").

occasion told him "she liked Spanish guys," and on a third occasion made a sexually suggestive comment about whether plaintiff could handle the fact there were several women in the workplace. Plaintiff further claims that Schaub and Collazo–Nieves called him a "fake Puerto Rican" and accused him of "want[ing] to be black." Finally, plaintiff claims that Schaub and Collazo–Nieves frequently engaged in conversation of a sexual nature.

Although Schaub exercised some supervisory responsibility at the Restaurant, Montanez has not described anything beyond some suggestive remarks that he quickly rebuffed. Murphy v. BeavEx, Inc., 544 F. Supp. 2d 139, 150 (D. Conn. 2008) ("Simple teasing, offhand comments, and isolated incidents . . . will not amount to discriminatory changes in the terms and conditions of employment sufficient to meet the threshold of severity or pervasiveness.").

Further, the record indicates that when Montanez communicated his complaints about Schaub (and in particular, the May 5 incident) to Mead, the manager determined that *both* parties had overreacted and attempted to take corrective action going forward. Considered individually or in the aggregate, no reasonable juror could conclude that "a reasonable employee would have found the abuse so pervasive or severe as to alter [plaintiff's] working conditions." Redd, 678 F.3d at 176. Accordingly, plaintiff's sexual harassment claim (Second Cause of Action) must be dismissed.

### C. **Title VII Retaliation** (Third Cause of Action)

Montanez's complaint also claims that the Restaurant retaliated against him "because [he] filed a complain[t] with the Division of Human Rights."

As with discrimination claims, on summary judgment "[c]laims of retaliation for engaging in protected conduct under Title VII . . . are examined under the McDonnell

Douglas burden shifting test." Joseph v. Owens & Minor Distrib., Inc., 5 F. Supp. 3d 295, 315 (E.D.N.Y. 2014) (footnote, citation, and explanatory parenthetical omitted).

A retaliation plaintiff must first establish a prima facie case by showing that: (1) he participated in a protected activity; (2) the defendant knew of the protected activity; (3) he suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015).

If the plaintiff sustains this initial, minimal burden, a presumption of retaliation arises, which the employer may rebut by articulating a legitimate, non-retaliatory reason for the adverse action. Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015). "If the defendant provides such an explanation, the presumption of retaliation dissipates and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." Id. (internal citations and quotation marks omitted).

As the Restaurant acknowledges, Montanez's May 14 and July 7 DHR complaints obviously constitute protected activity under Title VII. In addition, plaintiff's informal complaints to Mead and Dixon on May 7 and May 22 qualify as well. Amin v. Akzo Nobel Chems., Inc., 282 F. App'x 958, 961 (2d Cir. 2008) ("Informal complaints to management as to discrimination on a basis prohibited by Title VII are protected activity.").

Even so, no reasonable juror could conclude that Mead and/or Dixon's decision to place plaintiff on probation, or the eventual decision to terminate Montanez's employment, bear any causal relationship to any of plaintiff's protected activity, informal or otherwise. On the contrary, virtually all of the record evidence indicates that plaintiff's discipline and termination occurred in response to repeated workplace policy violations.

At best, Montanez's retaliation claim is based on the temporal proximity between the various events at issue. But the timing of events alone is insufficient to defeat summary judgment. Bush v. Fordham Univ., 452 F. Supp. 2d 394, 417 (S.D.N.Y. 2006). And the facts of this case illustrate why: plaintiff's term of employment reflects a compressed timeline of events where workplace policy violations, instances of progressive discipline, and examples of formal and informal protected activity are all bound up together. In the absence of some manner of additional evidence to suggest possible retaliatory animus, temporality itself cannot stand alone as evidence of causality. Accordingly, plaintiff's retaliation claim must be dismissed.

### D. Disability Claim

Although his federal court complaint only identifies the three causes of action discussed above, the Restaurant points out that Montanez's other filings indicate his possible intention to bring a claim for discrimination based on disability. According to plaintiff, Schaub and Collazo–Nieves stopped allowing him to take smoke breaks while he took out the trash after he told them he suffered from depression.

To avoid summary judgment dismissing a disability discrimination claim under the Americans with Disabilities Act ("ADA"), a plaintiff must establish a prima facie case of discrimination by showing that: (1) his employer is covered by the ADA; (2) he suffers from a qualifying disability; (3) he was qualified to perform the essential functions of his job, either with or without a reasonable accommodation; and (4) he suffered an adverse employment because of his disability. Hong Yin v. N. Shore LIJ Health Sys., 20 F. Supp. 3d 359, 372 (E.D.N.Y. 2014).

Montanez indicated that Mead was aware of plaintiff's history of depression at the time he hired him.  However, any ADA claim based on this impairment would fail at this first step of the analysis.  As with plaintiff's other discrimination claims, there is no indication that any of the qualifying adverse employment actions plaintiff suffered at the hands of Mead and/or Dixon were attributable in any way to his depression.

Notably, there is no indication in the record that Montanez was not permitted to smoke during his scheduled breaks.  To the extent plaintiff's filings suggest the Restaurant was required to permit plaintiff to smoke on duty or while he was taking out the trash, that argument is rejected—that is simply not the kind of "reasonable accommodation" contemplated by the ADA.  Accordingly, any disability discrimination claim must also be dismissed.

## V.  **CONCLUSION**

Even accounting for his status as a pro se litigant, no reasonable jury could find in Montanez's favor on any of his claims.

Therefore, it is

ORDERED that

1. Defendant McDean LLC's motion for summary judgment is GRANTED;

2. Plaintiff Isaac Montanez's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

Dated:  March 6, 2018
       Utica, New York.

United States District Judge